UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIMBERLY ANN REEVES,           :
                               :CIVIL ACTION NO. 3:15-CV-444
          Plaintiff,           :
                               :(JUDGE CONABOY)
          v.                   :
                               :
CAROLYN W. COLVIN, Acting      :
Commissioner of the Social     :
Security Administration,       :
                               :
          Defendant.           :
_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's

denial of Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  (Doc. 1.)

Plaintiff originally alleged disability due to fibromyalgia, PTSD,

depression, migraines, TBI, hypertrophic cardiomyopathy, carpal

tunnel bilateral, plantar fasciitis, shortness of breath and

insomnia.  (R. 176.)  In her application, Plaintiff said she

stopped working because of her conditions on September 28, 2012.

(*Id.*)  The Administrative Law Judge ("ALJ") who evaluated the claim

concluded that Plaintiff's severe impairments of fibromyalgia,

carpal tunnel syndrome, obesity, migraine headaches, post-traumatic

stress disorder ("PTSD"), panic disorder, anxiety disorder, and

major depressive disorder/depression did not alone or in

combination meet or equal the listings.  (R. 13-15.)  The ALJ found

that Plaintiff had the residual function capacity ("RFC") for light

work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 15-27.)  The ALJ therefore found Plaintiff was not disabled under the Act from September 28, 2012, through the date of the decision, October 14, 2014.  (R. 27-28.)

With this action, Plaintiff asserts that the case should be remanded for further administrative proceedings based on the following errors: 1) the ALJ's discussion of Plaintiff's Veterans Administration disability rating was insufficient; 2) the ALJ did not address the work-related limitations caused by Plaintiff's migraine headaches; 3) the ALJ did not properly evaluate the medical opinion of the Agency's examining consultant, Alfred Hardaway, M.D.; 4) the ALJ erred when he failed to assess Plaintiff's credibility in light of her work history; and 5) because the RFC does not accurately set out all of Plaintiff's individual impairments and limitations, the ALJ did not meet her step five burden of showing that Plaintiff can perform other work. (Doc. 14 at 2, 15.)

After careful consideration of the administrative record and the parties' filings, we conclude Plaintiff's appeal is properly granted.

## I. Background

### A.   *Procedural Background*

On April 29, 2014, Plaintiff protectively filed an application

2

for DIB.  (R. 11.)  As noted above, she alleges disability beginning on September 28, 2012, due to  fibromyalgia, PTSD, depression, migraines, TBI, hypertrophic cardiomyopathy, carpal tunnel bilateral, plantar fasciitis, shortness of breath and insomnia.  (R. 176.)  The claim was initially denied on June 19, 2014.  (R. 11.)  Plaintiff filed a request for a review before an ALJ on June 24, 2014.  (*Id.*)  On September 23, 2014, ALJ Michelle Wolfe held a video hearing at which Plaintiff and Vocational Expert Patricia Chilleri testified.  (*Id.*)  At the hearing, Plaintiff was represented by Andrew Youngman, a non-attorney representative. (*Id.*)  The ALJ issued her unfavorable decision on October 14, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 28.)

On December 5, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 6-7.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 7, 2015.  (R. 1-5.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On March 3, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on May 7, 2015.  (Docs. 12, 13.)  Plaintiff filed her supporting brief on June 22, 2015.  (Doc. 14.)  Defendant filed her opposition brief on July 14, 2015.  (Doc. 15.)  Plaintiff filed a reply brief

3

on July 28, 2015.  (Doc. 16.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.    *Factual Background***

Plaintiff was born on September 9, 1971, and was forty-one years old on the alleged disability onset date.  (R. 26.) Plaintiff testified that she has an associates degree in criminal justice.  (R. 60.)  Plaintiff has past relevant work as a claims processor, security guard, front desk clerk, housekeeper, correctional officer at a state hospital, and a chemical operations specialist.  (*Id.*)  Plaintiff served in the United States Army from 1989 to 2004 and is an Iraq War veteran.  (R. 550; Doc. 14 at 3.)

1.   **Impairment Evidence**

Because Plaintiff's claimed errors relate to certain physical impairments and specific opinions, our review will focus on evidence related to the alleged errors.

a.   **Migraine Headaches**

The following evidence charts the history of Plaintiff's migraine headache impairment.  We include related evidence to provide context.

A November 4, 2009, Neurology Resident Note from the Hunter Holme McGuire VA Medical Center states that Plaintiff was seen for follow up because of headache for which she was seen in the emergency department on October 21, 2009.  (R. 656.)  Plaintiff was prescribed Topamax and Imitrex and she reported the Imitrex had a

4

mild effect on her headache.  (*Id.*)  Because Plaintiff also
complained of eye redness at the emergency department, she was sent
to the eye clinic where some problems were noted and a lumbar
puncture was offered which Plaintiff refused.  (*Id.*)  Plaintiff
continued to report blurry vision at the November 4th visit.  (*Id.*)
It was noted that a lumbar puncture was necessary for a proper
diagnosis.  (R. 658-59.)  The pain assessment conducted at the time
indicates that the headaches were accompanied by nausea and an
inability to concentrate but did not affect Plaintiff's sleep,
mood, or activities of daily living.  (R. 559-60.)  Plaintiff
reported that the pain was sharp and unbearable, and she had the
headache constantly for days.  (*Id.*)  Her pain was eight out of ten
at the time.  (R. 660.)

Plaintiff was scheduled to have a lumbar puncture on November
5, 2009, but did not show up for her appointment.  (R. 648.)  The
procedure was rescheduled for November 9, 2009, but Plaintiff, who
arrived at the appointment with her husband, was anxious and
refused to continue with the procedure.  (*Id.*)  The procedure was
rescheduled for November 12, 2009.  (*Id.*)

A Primary Care Walk-in Patient Note of November 9, 2009,
authored by Cynthia Kosuda, a licensed practical nurse, indicates
that Plaintiff came in requesting a letter from her primary care
provider "stating why she can't work."  (R. 651.)  The note also
provides the following information: "She states that he has

5

difficulty falling and staying asleep and is drowsy during the day,
feels as though she has difficulty breathing at night, snores and
suffers with headaches daily.  She voices no complaint of pain at
this time." (*Id.*)  Ms. Kosuda discussed Plaintiff's request with
Wayne Ham, M.D., and Dr. Ham did not write the note but ordered a
sleep study.  (R. 652.)   Because Plaintiff was being seen by the
ENT and neurology clinics, Ms. Kosuda advised her to speak with the
clinics about the requested note.  (*Id.*)

On November 17, 2009, VA CWT/SE Treatment Plan Note addresses
Plaintiff's unemployed status and notes her strengths, abilities,
job needs and preferences, vocational goals, and barriers to
employment.  (R. 638-39.)  Medical difficulties were not noted to
be barriers.  (R. 639.)

On November 24, 2009, Plaintiff again presented to the
neurology clinic requesting medication for headache and stating the
neurologist had told her there was other medication she could take
but he did not order it.  (R. 621.)  Plaintiff rated her discomfort
at three out of ten and reported daily headaches with blurred
vision but denied nausea, vomiting, photophobia or phonophobia.
(*Id.*)  Plaintiff was informed that the neurologist's previous note
stated that a different medication would be considered depending on
the results of the lumbar puncture.  (R. 622.)  A November 29,
2009, Addendum to the note by the attending neurologist stated that
it was imperative to perform a lumbar puncture to properly diagnose

Plaintiff and she would be given Lorazapam to help reduce her anxiety for the procedure.  (R. 622-23.)

A December 1, 2009, VA Progress Note indicates that Plaintiff presented with a chief complaint of migraine headaches.  (R. 600.) The following history was recorded:

> 38 u/o WF with pmh of exposure to two bomb blasts in 2003 and new onset headache 10/2009.  She was seen in the ER 10/28/09 and found to have a swollen optic nerve, referred to opthamologist where she was dx with pseudotumor cerebi and referred to Neurology. Upon her visit to the Neurology clinic 11/4/09 a lumbar puncture procedure was attempted but the patient could not tolerate it.  The plan was to administer Diamox depending on the opening pressure.  She has been taking Topamax and Imitrex, Naproxen with very minimal relief it decreases from 7/10 ->3/10.

> Today she presents to the Neurology clinic complaining of new onset dizziness, blackouts and blurry vision.  She reports that she blacked out while sitting watching television lasting only a few minutes which was witness [sic] by her husband.  Prior to the blackout, patient experienced dizziness and lightheadedness.  She describes her headaches as being frontal and occipital with worse pain in the latter.  She also has photophobia and phonophobia.  She also c/o decreased sensation in her right hand and leg since 11/04/09.

(R. 600.)  The Assessment was "pseudotumor cerebri and migraine headaches with little relief from meds."  (R. 603.)  Plaintiff was scheduled for another lumbar puncture and was to follow up in the Neurology clinic one week thereafter.  (*Id.*)

Plaintiff had the lumbar puncture on December 3, 2009.  (R.

7

589-94.)

On December 7, 2009, Plaintiff presented to the Emergency Department complaining of headache, nausea and dizziness since the December 3rd lumbar puncture.  (R. 586.)  Plaintiff was given morphine for pain and a neurology consult was ordered.  (*Id.*) Assessment included the observation that "[h]eadaches could be secondary to tension headaches vs migrane [sic] headaches vs tumor vs sinus venous thrombosis vs aneurysm (non leaking aneurysm). Post LP pressure headache may be contributing to pts headaches." (*Id.*)  The plan included further diagnostic studies and changes to her medical regimen.  (*Id.*)

Plaintiff was seen in the neurology resident clinic on December 15, 2009, for follow up.  (R. 566.)  Plaintiff reported that the neurologist she saw on December 7th "discontinued the topiramate and started her on amitriptyline to titrate to 100 mg at bedtime." (*Id.*)  Plaintiff reported that she was taking 75 mg. and was doing well and she got significant relief from Imitrex (R. 564, 566.)  She also reported that she continued to have daily headaches but they were not as intense and did not last as long.  (R. 566.) The plan was to titrate Elavil to 100 mg. and if the headaches were not sufficiently controlled with Elavil, to restart Topamax at a low dose.  (R. 565.)

A VA psychology note from December 30, 2009, indicates that Plaintiff reported that she did not feel her physical and mental

health allowed her to work at the time.  (R. 549.)  The note

provides the following background information:

> Upon returning from Iraq, Ms. Reeves
> returned to her home in Pennsylvania, but
> changed jobs - she had previously worked for
> 9 years doing insurance claims for Tri-Care
> while in the reserves but changed to work as
> a police officer at a school. . . . She
> worked for 2.5 years, but decided to leave
> and move to Virginia to help care for her
> mother when she became ill.  She said she has
> since regretted moving as she has not found
> work she enjoyed and has been "very
> stressed."  She added that she remains in
> pain every day, has been very depressed, and
> some symptoms of PTSD.  She reported she has
> attempted to work three jobs, most recently
> leaving her job working as a housekeeping
> manager for a hotel after being treated in a
> negative way by her manager at the hotel.
> She currently is remaining at home and caring
> for her three children ages 10, 9, and 2.
> She has a fourth child from a prior marriage
> who has recently joined the Marines.

(R. 548-49.)

At a January 14, 2010, kinesiotherapy initial assessment,

Plaintiff's problem list included migraine headaches for which she

was on medication.  (R. 544.)  It was noted that Plaintiff was

unemployed and was going to school for her associates degree in

criminal justice but was thinking of changing her major to

respiratory therapy.  (R. 545.)

A January 14, 2010, psychology note indicates Plaintiff

reported feeling better since she got more medication for her

headaches and her mood had improved.  (R. 546.)  Plaintiff also

reported that she wanted to return to work and was hoping to return

to school to develop skills as a respiration therapist or x-ray technician--she no longer wanted to work in law enforcement due to physical and mental stresses.  (*Id.*)

On January 21, 2010, it was noted that Plaintiff's goal was "to get back to normal," and she was seeing neurology for headaches and was working on medication management.  (R. 538.)

A January 27, 2010, recreational therapy note stated that Plaintiff appeared more motivated and felt her medication was helping.  (R. 522.)  She planned to enroll her children in a summer camp and volunteer at the camp herself.  (*Id.*)

A February 3, 2010, treatment note indicated Plaintiff continued to complain of headaches and was being followed by neurology.  (R. 516-18.)  Interdisciplinary treatment goals included the following: "Client will obtain suitable employment. GOAL NOT MET -- MODIFY AND CONTINUE -- Client will verbalize plan for future employment or education."  (R. 518.)  Plaintiff's "Current Vocational Status" was listed as unemployed: she had recently quit a job in the hotel industry and had several (5) interviews but was not working.  (R. 519.)

A February 9, 2010, psychology note states that Plaintiff's issues were focused on PTSD and she seemed more engaged in making life choices.  (R. 513.)  She said her husband told her she needed to work because she was less irritable when working and Plaintiff agreed with the assessment--noting that she had done "adequately"

at her previous job until she had interpersonal issues with her boss.  (*Id.*) Additionally, Plaintiff reported that

> she is currently waiting on VA and social
> security claims to see if she qualifies and
> if she does she is hopeful she can afford
> daycare and return to college for her
> bachelor's degree to switch careers.  She has
> continued to apply for some positions, but
> has not found anything yet.  In the meantime,
> she is planning to fly to Portland, Oregon,
> to visit family and is hoping this respite
> from childcare will be helpful.

(*Id.*)

A sleep study was performed on March 20, 2010.  (R. 480.)  The Impression stated that the "recording does not suggest sleep disordered breathing . . . .  Sleep is fragmented without indication of cause.  (Medications, esp antidepressants, may contribute but other causes are certainly possible.)"  (*Id.*)

As Defendant notes, from March 2010 until January 2013 there are no medical records concerning Plaintiff's physical treatment. (Doc. 15 at 6.)

On January 19, 2013, consultative examiner Kimberly Jones, D.O., noted that Plaintiff presented for evaluation of her chief complaints, i.e., depression, PTSD, fibromyalgia, migraine headaches, dextroscoliosis, plantar fasciitis, and carpal tunnel syndrome with PTSD and fibromyalgia noted as her biggest problems. (R. 280.)  Regarding headaches, Dr. Jones noted they were believed to come from the concussion she experienced while in Iraq.  (R. 281.)  Plaintiff reported that she gets two migraines per week of

variable severity and she takes Imitrex for them. (*Id.*) Plaintiff added that she gets nausea and vomiting with the headaches, has passed out from them in the past and is unable to tolerate light when she has a headache. (*Id.*) Plaintiff was having a migraine at the time of her visit which Dr. Jones stated caused her moderate distress. (R. 283.) Dr. Jones recorded that Plaintiff stopped working as a correctional officer in September 2012 because of her claustrophobia, PTSD, and being unable to tolerate going up and down the stairs. (*Id.*) Plaintiff reported that she was doing all household chores but had difficulty with stairs and did not mow the grass. (R. 281-82.) Dr. Jones' Impressions included migraine headache. (R. 285.) Dr. Jones found no objective functional limitations but stated that Plaintiff had a blunted affect which appeared to correlate with her reported history of PTSD and depression. (*Id.*)

Plaintiff was seen on December 6, 2013, for primary care follow up by CRNP Kathryn Wilt. (R. 304.) Plaintiff reported that headaches occurred two or three times per week and she gets good relief with Imitrex. (R. 305.)

On June 16, 2014, Plaintiff was seen by Alfred Hardaway, M.D., for a consultative examination. (R. 334.) Plaintiff's chief complaints were similar to those expressed to Dr. Jones in January 2013. (*See* R. 334.) Plaintiff reported at least two headaches per week with no visual field defects. (*Id.*) Plaintiff continued to

12

take Imitrex for the headaches.  (*Id.*)  Dr. Hardaway's diagnosis included migraine headaches.  (R. 337.)

Plaintiff saw Amit Mehta, M.D., a family practitioner at Geisinger Lock Haven in June and July of 2014, with the chief complaint of right knee pain.  (R. 356-63.)  On July 8, 2014, it was noted that Plaintiff also had complaints of lower backache and some stiffness/discomfort in her shoulders and rotation was tender. (R. 356.)  It was also noted that Plaintiff had a history of fibromyalgia.  (*Id.*)  Migraine headaches are not mentioned.  (*See* R. 356-63.)

**b.   Hardaway Opinion**

Dr. Hardaway completed a Medical Source Statement of Ability To Do Work Related Activities on June 16, 2014.  (R. 339-44.)  He noted certain lifting and carrying limitations due to fibromyalgia. (R. 339.)  Though Dr. Hardaway found some sitting, standing and walking limitations, the total time for sitting standing and walking equaled eight hours.  (R. 340.)  Dr. Hardaway also found Plaintiff had some postural limitations due to back pain and certain environmental limitations due to Plaintiff's claims that she had fibromyalgia pain in certain conditions.  (R. 342-43.)  In answer to the question of whether Plaintiff could travel without a companion for assistance, Dr. Hardaway checked "no" and noted that this assessment was based on Plaintiff's PTSD and fibromyalgia pain.  (R. 344.)

c.    **Veterans Disability**

A letter from the Department of Veterans Affairs dated May 12, 2014, states the following: Plaintiff's "combined service-connected evaluation" is 70%; the effective date of the last change to her service award was December 1, 2013; Plaintiff was being paid at the 100% rate because she was "unemployable" due to her service-connected disabilities; and Plaintiff was considered to be totally and permanently disabled due to her service-connected disabilities. (R. 144.)  The correspondence indicated that it had been determined that the increase in percentage was granted because Plaintiff's PTSD and fibromyalgia had worsened: effective May 27, 2011, the PTSD percentage went from 30% to 50% and the fibromyalgia percentage from 10% to 40%.  (R. 145.)  The effective date for Plaintiff's individual unemployability was identified as May 27, 2011.

3.    **Hearing Testimony**

Plaintiff testified that she stopped working as a corrections officer for the GEO Group in September 2012 because her pain had gotten worse and she was missing a lot of days and she believed her options were to quit or be fired so she decided to quit so she would not have a termination on her record.  (R. 61, 63.)  She had worked there for about five months.  (R. 70.)  She stated that she tried to look for work after she left GEO but medications had been added which made her nauseous and sleepy so she felt she could not

14

go back to work full time.  (R. 64.)  Plaintiff also said her fibromyalgia had gotten worse since 2012, she was being tested for another muscle disease, and she still had migraines once or twice a week which require her to be in bed with light blacked out and no noise.  (*Id.*)

Before GEO, Plaintiff worked from June 2010 to January 2011 at a state hospital with a job function similar to that of a corrections officer.  (R. 72-73.)  Plaintiff was terminated for missing two weeks of work, an absence she attributed to pressure and bleeding in her eyes.  (R. 73.)  Plaintiff testified that she left her previous job as a hotel housekeeping manager when she had "interpersonal issues" with the manager after she returned from an absence due to chest pain and a heart attack.  (R. 74.)  She had worked at the hotel for approximately six months.  (*Id.*)

Plaintiff testified that she at one time had migraines five days a week but, with medication, the frequency was reduced to one or two days a week.  (R. 64, 77-78.)  She testified that when she has a migraine she goes to bed with the lights blacked out and no noise and the headache can last from four to twenty-four hours. (R. 64, 78.)  She said the Imitrex works for the milder headaches but the more severe ones she just has to "wait them out."  (R. 78.)

The Vocational Expert ("VE") was asked to consider a hypothetical individual with the same age, education and work history as Plaintiff who had the RFC to perform work at the light

exertional level but subject to limitations.  (R. 89-90.)

> The individual would have the ability . . .
> [to] occasional[ly] balance, stoop, crouch,
> crawl, kneel, as well as climb but never on
> ladders, ropes or scaffolds.  The individual
> will need frequent pushing and pulling with
> the upper extremities and lower extremities
> and frequent gross and fine manipulation.
> The individual would need to avoid
> concentrated exposure to temperature extremes
> of cold and heat, wetness, humidity, fumes,
> odors, dust, gases and poor ventilation as
> well as vibrations and would need to avoid
> moderate exposure to excessive loud noise
> such as traffic or jackhammer noise . . . and
> hazards such as moving machinery and
> unprotected heights.  The individual can do
> simple, routine tasks but no complex tasks
> and should work in a low stress environment
> defined as occasional decision making and
> occasional changes in the work setting.  The
> individual further would need to have
> occasional interaction with co-workers and
> supervisors and no interaction with the
> public.

(R. 90.)  The VE testified that such an individual could not

perform any of Plaintiff's past work.  (*Id.*)  The VE further

testified that other jobs existed in significant numbers in the

national economy that the hypothetical individual could perform,

identifying "weighers, checkers and measures," administrative

support worker, and production helper by way of example.  (R. 91.)

When asked by Plaintiff's representative if the hypothetical

individual were to consistently miss two days per month whether

there would be jobs that individual could perform, the VE responded

that there would not be.  (R. 100-01.)

16

**4.**   __ALJ Decision__

By decision of April 25, 2014, ALJ Wolfe determined that Plaintiff was not disabled as defined in the Social Security Act from September 28, 2012, through October 14, 2014, the date of the decision.  (R. 27-28.)  She made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.
>
> 2.   The claimant has not engaged in substantial gainful activity since September 28, 2012, the alleged onset date (20 CFR 404.1571 *et seq*).
>
> *3.*   The claimant has the following severe impairments: fibromyalgia, carpal tunnel syndrome, obesity, migraine headaches, post-traumatic stress disorder (PTSD), panic disorder, anxiety disorder, an major depressive disorder/depression (20 CFR 404.1520(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally balance, stoop, crouch, crawl, kneel, and climb, but she can never climb on ladders, ropes, and scaffolding.  The claimant can frequently push/pull with the upper extremities and lower extremities.  She

can frequently perform gross and fine manipulation. The claimant must avoid concentrated exposure to temperature extremes of cold/heat, wetness, humidity, fumes, odors, dust, gases, poor ventilation, vibrations, and avoid moderate exposure to excessive loud noise such as traffic or jackhammer noise and hazards including moving machinery and unprotected heights. She can do simple, routine tasks, but no complex tasks and she should work in a low stress environment defined as occasional decision-making and occasional changes in the work setting. The claimant can have occasional interaction with co-workers and supervisors and no interaction with the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on September 9, 1971 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can

> > perform (20 CFR 404.1569 and
> > 404.1569(a)).
>
> > 11. The claimant has not been under a
> > disability, as defined in the Social
> > Security Act, from September 28, 2012,
> > through the date of this decision (20
> > CFR 404.1520(g)).

(R. 13-27.)  ALJ Wolfe thoroughly reviewed the medical evidence (R. 16-22) and noted that there did not appear to be any medical treatment from about March 2010 to January 2013 or, in the alternative, no records were submitted for this period of time. (R. 17.)  The ALJ's review began with pre-alleged onset date records beginning in November 2009.  (R. 16.)

After extensively reviewing Plaintiff's statements about her activities and the limiting effects of her impairments, the ALJ determined that Plaintiff was not entirely credible, finding the objective medical evidence did not support the degree of limitation alleged and citing specific bases for the credibility determination.  (R. 22-25.)

The ALJ reviewed opinion evidence including the Veterans Administration disability rating, the Third Party Function Report completed by Plaintiff's husband and the opinions of Doctors Jones, Cole and Hardaway.  (R. 26-27.)  The ALJ gave some weight to the VA opinion contained in correspondence dated May 12, 2014, which indicated that Plaintiff had a seventy percent disability rating and got one hundred percent benefits, noting that as of May 2011 Plaintiff had fifty percent disability due to PTSD and forty

19

percent due to fibromyalgia but she continued to work after May 2011, i.e., until September 2012.  (R. 25.)  The ALJ also noted that Social Security and VA disability standards differ.  (*Id.*) She gave little weight to Plaintiff's husband's opinion because of the relationship and because he is not an acceptable medical source.  (*Id.*)  ALJ Wolfe gave little weight to Dr. Jones' opinion because she did not find any objective functional limitations and there was not evidence for the lack of limitations related to standing, sitting and walking given Plaintiff's history of fibromyalgia.  (R. 25.)  For the most part the ALJ gave great weight to Dr. Andrew Cole's opinion based on his psychiatric evaluation of Plaintiff on June 13, 2014.  (*Id.*)  The ALJ gave some weight to Dr. Hardaway's RFC findings but noted that Plaintiff was more limited in her ability to climb ladders, ropes, and scaffolds given her history of fibromyalgia and his opinion was generally supported by rather benign findings in his own examination.  (R. 26.)  ALJ Wolfe also considered the January 10, 2013, GAF score of 51 assigned by VA Licensed Social Worker Frances Yohannan, concluding it showed no more than moderate limitations in Plaintiff's overall functioning but it is a subjective score based on Plaintiff's subjective complaints.  (*Id.*)

The ALJ noted that she took into account Plaintiff's credibly established limitations in determining her RFC.  (R. 16.)

Consistent with the testimony of the VE, the ALJ found

Plaintiff could not perform her past relevant work.  (R. 26.)  With the assistance of the VE, the ALJ concluded that Plaintiff was able to perform other jobs which exist in the national economy.  (R. 26-27.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff was capable of performing work that existed in significant numbers in the national economy.  (R. 26-27.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to

support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*,

181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for analysis lacking in the ALJ's decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07. Neither the reviewing court nor the defendant "may create or

adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Hague v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.")

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases

demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."   *Id.*

## B.   *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts that the case should be remanded for further administrative proceedings based on the following errors: 1) the ALJ's discussion of Plaintiff's Veterans Administration disability rating was insufficient; 2) the ALJ did not address the work-related limitations caused by Plaintiff's migraine headaches; 3) the ALJ did not properly evaluate the medical opinion of the Agency's examining consultant Alfred Hardaway, M.D.; 4) the ALJ erred when he failed to assess Plaintiff's credibility in light of her work history; and 5) because the RFC does not accurately set out all of Plaintiff's individual impairments and limitations, the ALJ did not meet her step five burden of showing that Plaintiff can perform other work. (Doc. 14 at 2, 15.)

## 1.   <u>Veterans Administration Disability Rating</u>

Plaintiff asserts that the ALJ improperly discounted the VA disability rating because she cited only the 2011 lower disability rating without discussing the May 2014 notice which increased benefits to 100% and the other reasons provided by the ALJ are without merit.  (Doc. 14 at 4-6.)  We disagree.

In *Kane v. Heckler*, 776 F.3d 1130 (3d Cir. 1985), the Third Circuit Court of Appeals stated that the ALJ should have considered the importance of a Veterans Administration determination that the plaintiff was disabled because "[s]uch a determination by another government agency is entitled to substantial weight." *Id.* at 1135 (citing *Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980)). 20 C.F.R. § 404.1504 addresses disability determinations by other organizations or agencies:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency . . . is not binding on us.

*Id.* Pursuant to SSR 06-03p, the ALJ is "required to evaluate all the evidence in the case record that may have a bearing on [her] determination or decision of disability, including decisions by other governmental and nongovernmental agencies." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A.).

Here the ALJ considered the VA's disability determination and cited reasons why she afforded it only "some weight." (R. 25.) Contrary to Plaintiff's assertion, the ALJ did not cite only an earlier lower disability rating. (*See* Doc. 14 at 4.) Rather, the ALJ cited to the May 12, 2014, Department of Veterans Affairs correspondence in which Plaintiff was found to a 70% disability

rating and was being paid at the 100% rate.  (R. 25 (citing Ex. 2D
(R. 143-45)).)  Plaintiff takes issue with the ALJ's notation that
Plaintiff worked until September 2012 though she was found in May
2011 to be 50% disabled due to PTSD and 40% disabled due to
fibromyalgia.  (*See* Doc. 14 at 5.)  We find no reversible error on
this basis.  The ALJ's decision clearly states that she considered
the VA's 100% benefits award.  (*See* R. 25.)  It is also true that
the VA found that Plaintiff's fibromyalgia and PTSD were found to
have worsened effective May 27, 2011, and this was the basis for
the award of a higher percentage.  (R. 145.)  Thus the ALJ did not
improperly note that Plaintiff worked past the date when these
conditions were found to have worsened.  Finally, Plaintiff
recognizes her argument in her supporting brief that "individual
unemployability" in the VA consideration and SSA disability as
"identical" was not an accurate portrayal of the standards.  (Doc.
16 at 3.)  For all of these reasons, we find Plaintiff's first
claimed error does not provide a basis for remand.

**2.   Migraine Headaches**

Plaintiff next claims error based on the ALJ's consideration
of her migraine headaches because no related limitations are
addressed in the her RFC finding.  (Doc. 14 at 6.)  We conclude
that the ALJ's consideration of Plaintiff's migraine headache
impairment is cause for remand.

The ALJ found Plaintiff's migraine headaches to be a severe

impairment during the relevant time period, i.e, from September 2012 to October 2014.  (R. 13.)  Plaintiff described her headaches to Dr. Jones and Dr. Hardaway in January 2013 and June 2014 stating that she gets two migraines a week of variable severity.  (R. 281. 334.)  She testified about their severity and limiting effects at the ALJ hearing on September 23, 2014, including the fact that they are not always helped by medication and can be incapacitating.  (R. 64, 77-78.)  The ALJ acknowledged that Plaintiff testified that even with medication she continued to get headaches one to two days a week and when she has a migraine she goes to bed with light blacked out and no noise.  (R. 23.)  In providing the reasons for discounting Plaintiff's credibility, the ALJ noted that Plaintiff "complained of significant headaches in 2009-2010, but the complaints decreased significantly once she was prescribed Imitrex."  (R. 25.)  Other than acknowledging Plaintiff's testimony in her review of evidence, the ALJ does not discuss any evidence related to Plaintiff's headaches during the relevant time period, nor does she provide a reason for not doing so.  Thus, the ALJ does not provide a reason for discounting the limiting effects asserted by Plaintiff--effects which if credited may preclude Plaintiff from competitive employment as per the VE's testimony.  (*See* R. 100-01.)

While there may be many bases to discount the effects of Plaintiff's headaches on her ability to work (some of which are suggested by Defendant (Doc. 15 at 22)), none of these are

addressed by the ALJ in a generally very thorough decision.  We hesitate to remand on this basis but find it necessary to do so because neither Defendant nor the Court can do what the ALJ should have done--we cannot provide *post hoc* reasons for supporting the ALJ's decision.  It is the ALJ's responsibility to explicitly provide reasons for her decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.  *Fargnoli*, 247 F.3d at 42; *Dobrowolsky*, 606 F.2d at 406-07.  Therefore, upon remand the ALJ must more thoroughly articulate her consideration of Plaintiff's migraine headaches and the effects the symptoms may have on her ability to work.

**3.   Evaluation of Hardaway Opinion**

Plaintiff asserts the ALJ improperly evaluated Dr. Hardaway's opinion in that she did not address Dr. Hardaway's limitation that Plaintiff should not travel without a companion for assistance. (Doc. 14 at 9-10.)  While this claimed error would not be cause for remand on its own, because we have determined remand is required, the ALJ is requested to address the omission of Dr. Hardaway's finding regarding travel.

**4.   Plaintiff's Credibility**

Plaintiff next claims the ALJ erred when she did not assess Plaintiff's credibility in light of her military service and work history.  (Doc. 14 at 12.)  We disagree.

As noted by both parties, an ALJ's credibility findings are

due great deference.  (Doc. 12 at 14; Doc. 15 at 23-24.)  Plaintiff cites SSR 96-8p for the proposition that an adjudicator must consider a claimant's strong work history when evaluating credibility and the ALJ fails to discuss Plaintiff's "stellar work history" prior to her disability onset.  (Doc. 14 at 12.) Plaintiff also cites *Dobrowolsky*, 606 F.2d 403, for the proposition that "a long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments."  (Doc. 14 at 13.)

We do not discount the authority relied upon by Plaintiff and do not minimize Plaintiff's military service and work history. However, in the circumstances of this case, certain evidence offsets what Plaintiff describes as her "stellar work history."  As noted by the ALJ, Plaintiff wanted a note from her doctor that she could not work in 2009, but he would not give her one.  (R. 25.) Plaintiff's request occurred at a time when Plaintiff was unemployed but devising employment strategies with a VA caseworker, was applying for jobs, and was expressing a desire to go back to work and/or school.[2]  (R. 513, 518, 519, 546, 638-39, 647.)  The ALJ also noted that Plaintiff continued to work until 2012.  (R. 25.)  Thus, in the circumstances of this case, the cited authority

---

[2]  Significantly, as Defendant notes, from September 2006 until September 2012, Plaintiff worked four jobs but for no more than eight months at a time and with significant gaps between positions.  (Doc. 15 at 24 (citing R. 162).)

does not suggest the ALJ should have discussed Plaintiff's work history.

## 5.    **Step Five Determination**

Finally, Plaintiff asserts the ALJ did not meet her step five burden of showing that Plaintiff can perform other work.  (Doc. 14 at 14.)  Because we have found that this matter must be remanded for further consideration of Plaintiff's migraine headache impairment, and because such consideration will involve and/or clarify the ALJ's step five finding, further discussion of this issue is not warranted.

## V. Conclusion

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 30, 2015

33